UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AUSTRALIAN GOLD, LLC, Plaintiff, | ) | |
| v. | ) | No. 1:26-cv-02377-JRS-MKK |
| LILY OZELL, Defendant. | ) | |

**Order on Motion for Temporary Restraining Order**

Plaintiff Australian Gold, LLC ("Australian Gold") alleges that a former employee, Defendant Lily Ozell, stole hundreds of company files and immediately joined a direct competitor. (Compl. ¶ 1, ECF No. 1.) It claims that this theft of confidential information violates state and federal trade secrets laws, and breaches Ozell's contractual obligations. (*Id.*) Australian Gold has filed a Motion for Temporary Restraining Order. (ECF No. 5.) It asks the Court to enjoin Ozell from possessing and disclosing Australian Gold's trade secrets, prohibit Ozell from breaching her agreement with Australian Gold, and require her to identify and return all confidential information she took. (Proposed TRO 2, ECF No. 5-1.)

Considering the relevant factors, Australian Gold's Motion for Temporary Restraining Order, (ECF No. 5), is **granted**.

## I. Background[1]

Australian Gold is a "global developer and manufacturer of sun care, tanning, and skincare products." (Compl. ¶¶ 2–3, 14–15.) "Its products include sunscreens, indoor tanning lotions, bronzers, [and] sunless tanning products." (*Id.* ¶ 14.) Australian Gold "invests significant time and resources" to research, formulate, test, manufacture, and market its products. (*Id.* ¶ 15.)

Ozell began working for Australian Gold as a research and development chemist in October 2023. (*Id.* ¶¶ 4, 21.) In that position, she helped test and develop "new and existing product formulas" and research and evaluate ingredients. (*Id.* ¶ 22.) She had "access to Australian Gold's confidential and proprietary information, including product formulas, ingredient research, testing results, supplier information, manufacturing processes, and products under development." (*Id.* ¶ 23.)

As a condition of employment, Ozell agreed that all intellectual proprietary she created would belong to Australian Gold, as well as that she would not disclose Australian Gold's confidential information. (*Id.* ¶¶ 24–33.)

First, Ozell signed a "Confidentiality & Intellectual Property Agreement" which "addresse[d] Australian Gold's ownership of intellectual property." (*Id.* ¶ 28.) Under the Agreement, Ozell agreed to "assign to [Australian Gold] any and all [proprietary]

[1] These facts are taken from Australian Gold's Complaint, the brief in support of the TRO, and exhibits. Ozell has not materially disputed these facts. Indeed, she has *admitted* that the key conduct in question—copying Australian Gold files to a personal external drive—occurred. (*See* Def.'s Resp. 1–2, ECF No. 19 (providing an explanation for copying company files to a personal USB drive).) The Court thus accepts Australian Gold's factual allegations for purposes of resolving the present motion. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

material" that she generated (1) during her employment and (2) "which relate[d] to or [was] capable of use in connection with the subject matter of [the Confidentiality] Agreement and with the business of Australian Gold." (Confidentiality Agreement ¶ 4, ECF No. 1-1.) So all "trade secrets, trademarks, patentable ideas, processes or inventions or copyrightable works" that Ozell "conceive[d], invent[ed], author[ed,] or discover[ed]" within the scope of her employment would "become and remain sole property of Australian Gold." (*Id.*)

In the Agreement, Ozell also promised to hold Australian Gold's private information "in strict confidence." (*Id.* ¶¶ 26–28; (quoting Confidentiality Agreement ¶ 2, ECF No. 1-1).) She likewise promised "not to use the information commercially for [her] own benefit or for the benefit of anyone except [the] Company." (*Id.*) The Agreement defined "confidential information as "[a]ll information not generally provided to the public that [was] supplied by [Australian Gold] to [Ozell]." (*Id.*) It stated that such information would remain confidential even after Ozell's employment concluded. (*Id.*)

Ozell also agreed to comply with Australian Gold's Handbook which imposed similar confidentiality obligations. (Handbook 2, ECF No. 1-2.) The Handbook reiterated the requirement that Ozell sign and abide by the Confidentiality Agreement. (Compl. ¶¶ 29–30.) It also clarified that Ozell maintained an obligation "to comply with all requirements of the Agreement" both during employment and "beyond the date of separation." (*Id.* (quoting Handbook 15, ECF No. 1-2).) The Handbook also requires all employees with access to confidential information to

"maintain the confidentiality of competitively sensitive business information." (*Id.* ¶ 30–33; *see* Handbook 12, ECF No. 1-2.)

Australian Gold takes other steps to protect its confidential information, too. It limits "access to certain computer files" to "only designated individuals" who need it. (Compl. ¶ 34, ECF No. 1.) And it "limit[s] access to the physical premises of its quality control laboratory, research and development facilities, human resources records, and office and warehouse through the use of key fobs." (*Id.*)

Ozell "submitted her resignation on September 10, 2026," and had an "anticipated last day of September 24, 2026." (*Id.* ¶ 36.) But she "became increasingly short and difficult to work with" during her final two weeks, which led Australian Gold to "accelerat[e] her departure date" to three days earlier than planned and accept her resignation "effective immediately" on September 21, 2026. (*Id.* ¶¶ 36–38 (internal quotation marks omitted).) Before Ozell left, however, she requested that she "return to her office to collect her personal belongings and say goodbye to her co-workers," and her supervisor agreed to let her do so. (*Id.* ¶ 39.)

Australian Gold conducted an investigation following Ozell's departure. A review of Ozell's LinkedIn profile indicated she had begun working for Bell Labs as a research and development chemist immediately after leaving Australian Gold. (*Id.* ¶ 42.) The investigation performed by an experienced IT Support Technician found that, in the month preceding Ozell's departure, she had "connected an external Memorex drive" to her company laptop on six different occasions. (*Id.* ¶ 47–48.) Without Australian Gold's authorization, Ozell "copied over 500 files" onto the

Memorex drive, (*id.* ¶ 46; *see* Def.'s Resp. 1–2, ECF No. 19), and "deleted a total of 543 items from the Company's storage systems," (Compl. ¶ 49, ECF No. 1). Additionally, "431 of the[] deleted items [were] associated with matching folders on the Memorex Drive." (*Id.* ¶ 50.)

The timing of Ozell's transferring documents also aroused suspicion. The last time that she copied files to the Memorex drive and deleted them from her computer was mere "minutes after . . . Ozell learned her resignation had been accepted effective immediately." (*Id.* ¶ 52.) So when Ozell asked to return to her office "to collect her personal items," she instead went back to copy and delete files for a final time. (*Id.*; Ayodele Decl. ¶ 18, ECF No. 6-2.)

The files Ozell copied to the Memorex drive contain different "categories of Australian Gold['s] confidential and proprietary information." (Compl. ¶ 53, ECF No. 1.) For example, the files relate to: "(i) new product ingredient research; (ii) D5 replacement research; (iii) fragrance evaluations and supplier information; (iv) manufacturing equipment proposals; (v) future product development plans for 2028; (vi) product formulas, SPF testing, and stability studies; and (vii) manufacturing processes and mixing procedures." (*Id.*; Jester Decl. ¶ 19; ECF No. 6-3.) Australian Gold's CEO, the IT Technician, and Ozell's immediate supervisor all corroborated the contents and confidential nature of the stolen files. (*Id.* ¶¶ 19–20; Sperry Decl. ¶¶ 22–23, ECF No. 6-1; Ayodele Decl. ¶¶ 19–20, ECF No. 6-2.)

Some of the documents Ozell downloaded related to Australian Gold's "fragrance files." (Pl.'s TRO Br. 10, ECF No. 6 (internal quotation marks omitted).) These

documents include "supplier information, internal fragrance evaluations, and rankings used in developing products for 2027 and 2028." (*Id.* at 10 (citing Jester Decl. ¶ 19, ECF No. 6-3; Sperry Decl. ¶ 23, ECF No. 6-1; Ayodele Decl. ¶ 18, ECF No. 6-2).) It normally takes Australian Gold more than a year to "develop and evaluate [its] proprietary fragrances." (*Id.*) Australian Gold's CEO testified that "this fragrance information would allow a competitor to [unfairly] shortcut [its] development efforts." (Sperry Decl. ¶ 23, ECF No. 6-1.)

Other documents that Ozell obtained dealt with Australian Gold's research to find replacements for D5. (Pl.'s TRO Br. 10–11, ECF No. 6.) D5 is "a silicone ingredient subject to regulatory restrictions in the European Union," and "Ozell participated in the research and testing for potential D5 replacements." (*Id.* (citing Sperry Decl. ¶ 23, ECF No. 6-1).) So Ozell worked on developing "confidential product formulas," comparing ingredients, analyzing "testing results," and performing "stability studies" on these D5 alternatives. (*Id.* (citing Sperry Decl. ¶ 23, ECF No. 6-1).) The IT investigation showed that, on one occasion in early September, "Ozell opened a document entitled 'D5 Comparisons.xlsx' from Company storage and, approximately four minutes later, opened a copy of the same file from the Memorex drive." (*Id.* (citing Jester Decl. ¶ 19, ECF No. 6-3).) On another occasion, "a folder titled 'D5' was created on the Memorex drive approximately 15 seconds before nine D5 replacement research files were deleted from Company storage." (*Id.* (citing Jester Decl. ¶ 17, 20, ECF No. 6-3).) The IT technician concluded that this data "suggest[ed] that Ozell

transferred these D5 files to the Memorex drive before deleting them." (*Id.* (citing Jester Decl. ¶¶ 17, 20, ECF No. 6-3).)

Finally, Ozell also transferred "manufacturing equipment proposal files." (Pl.'s TRO Br. 10–11, ECF No. 6.) Australian Gold had also been "evaluating new mixing equipment to manufacture sunscreen products in-house." (*Id.* (citing Sperry Decl. ¶ 23, ECF No. 6-1).) Here, too, Ozell created a folder on the Memorex drive entitled '1 New Equipment Proposal'" only seconds before "files and folders related to equipment proposals were deleted from Company storage." (*Id.* (citing Jester Decl. ¶ 19, ECF No. 6-3).)

Australian Gold's investigation is not yet complete, so "the full extent of the information Ozell may have retained, transferred, or disclosed has not yet been determined." (Compl. ¶ 75.) But Australian Gold believes that "Ozell continues to possess copies of Australian Gold's trade secret, confidential and proprietary information." (*Id.* ¶ 72.) And it argues that these circumstances—Ozell's immediate employment with a direct competitor, her "unexplained and repeated connections of a personal drive to her Company computer near the time of her resignation," and the deletion and transfer of internal files—suggest that Ozell may improperly use Australian Gold's confidential information in her position with her new employer. (*Id.* ¶ 76.)

Based on that threat, Australian Gold brings claims for (I) breach of contract, (II) misappropriation of trade secrets in violation of Indiana and federal law, (III) breach

of duty of loyalty, (IV) computer trespass, (V) unjust enrichment, (VI) conversion, and (VII) unfair competition. (*Id.* ¶¶ 81–124.)

Australian Gold also filed a Motion for Temporary Restraining Order. (ECF No. 5.) The requested TRO contains three components. (Proposed TRO 2, ECF No. 5-1.) Australian Gold asks the Court to (1) enjoin Ozell from possessing, using or disclosing its property including trade secrets, confidential information, proprietary information; (2) prohibit her from breaching her agreement with Australian Gold by using or disclosing Australian Gold's confidential information, and (3) require her to identify and return all trade secrets, confidential and proprietary information she took or deleted from Australian Gold's computer systems, and to obtain independent verification that she complied with these requirements. (*Id.*)

## II. Legal Standard

Federal Rule of Civil Procedure 65 authorizes the Court to issue temporary restraining orders (TRO). *See* Fed. R. Civ. P. 65. Preliminary relief is intended to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas*, 451 U.S. at 395.

The same standards that govern whether preliminary injunctive relief is proper also govern whether a TRO is proper. *J.P. Morgan Sec. LLC v. Weiss*, No. 1:19-cv-04163, 2019 WL 6050176, at *4 (S.D. Ind. Nov. 15, 2019). Under those standards, the Court may issue a TRO if a plaintiff demonstrates that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) the TRO is "in the public

interest." *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 613 (7th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Although likelihood of success on the merits presents a "significant burden," it should "not spill into the ultimate merits." *Id.* at 614 (citation modified). A plaintiff "is not required to prove his case in full," *Univ. of Texas*, 451 U.S. at 395, or even "prove [his] claims . . . by a preponderance of the evidence" at this early stage, *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023). Instead, a movant must provide enough evidence to show how he "proposes to prove the key elements of its case." *Id.*

The Court also weighs these factors using a "sliding scale approach." *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). "[T]he more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side," and vice versa. *Id.*

## III. Discussion

Considering the relevant factors, the Court concludes that Australian Gold has met its burden for obtaining a TRO. It has shown a strong likelihood of success on the merits, and the remaining factors also lean in favor of granting the TRO.

### A. Likelihood of Success on the Merits

Australian Gold is likely to succeed on the merits. Its core claims are that Ozell breached her contract and violated state and federal trade secrets laws. And on both of these fronts, Australian Gold is likely to prevail.

### 1. Breach of Contract

Take the breach of contract claim first. Under Indiana law, a breach of contract claim requires proof of three elements: that (1) a contract exists, (2) the defendant breached the contract, and (3) the plaintiff suffered damages. *Murat Temple Ass'n, Inc. v. Live Nation Worldwide, Inc.*, 953 N.E.2d 1125, 1128–29 (Ind. Ct. App. 2011). State law permits a business to contract to protect its trade secrets and other "confidential information." *McGlothen v. Heritage Env't Servs., L.L.C.*, 705 N.E.2d 1069, 1072 (Ind. Ct. App. 1999). Even a "covenant not to compete"—which is generally "disfavored"—may be used to protect confidential information if it "is reasonably necessary to protect the employer, is not unreasonably restrictive of the employee, and is not against public policy." *Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507, 510 (Ind. 1995). Further, "Indiana courts recognize the freedom of parties to enter into contracts and, indeed, presume that contracts represent the freely bargained agreement of the parties." *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind. 1995).

The "clear and unambiguous language" of a contract controls. *Ryan v. TCI Architects/Eng'rs/Contractors, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017). So questions of contract interpretation "turn[] on the precise language" of the contract. *Fresh Cut, Inc.*, 650 N.E.2d at 1131. For example, a contract containing an "express assignment" of a company's proprietary information "evinc[es] an intent that the [information] should belong to" the company. *Michels v. Dyna-Kote Industries, Inc.*, 497 N.E.2d 586, 589–91 (Ind. Ct. App. 1986).

Here, Australian Gold is likely to succeed in showing Ozell breached her contract.

First, Australian Gold can likely show a contract exists. It has submitted two types of documents that likely could be considered contracts: a Confidentiality Agreement and the agreement to abide by the company handbook. (Confidentiality Agreement, ECF No. 1-1; Handbook 2, ECF No. 1-2.) In the Confidentiality Agreement, Ozell made a variety of promises. She agreed that Australian Gold would own all proprietary information she created during her employment that related to her employment. (Confidentiality Agreement ¶ 4, ECF No. 1-1.) She also agreed that all information "not generally provided to the public" would be considered confidential, and she promised to not use Australian Gold's confidential information for the benefit of anyone or any entity besides Australian Gold. (*Id.* ¶¶ 1–2.) Ozell made similar promises in signing the Handbook acknowledgment. (Handbook 2, 12, 15, ECF No. 1-2.)

These agreements are likely enforceable under Indiana law. Even though both are form agreements, Indiana law presumes that these "contracts represent the freely bargained agreement" between Ozell and Australian Gold. *Fresh Cut, Inc.*, 650 N.E.2d at 1129. The confidentiality provisions seek to protect Australian Gold's "confidential information," which is a permissible goal. *McGlothen*, 705 N.E.2d at 1072. Similarly, the provision that states Australian Gold will own all proprietary information Ozell created during her employment is the type of "express assignment" of proprietary information that Indiana courts enforce. *Michels*, 497 N.E.2d at 589–91; *see N. Elec. Co. v. Torma*, 819 N.E.2d 417, 422 (Ind. Ct. App. 2004) ("[V]aluable

information that is the product of an employee's assigned duties is owned by the employer, even when the information results from the application of the employee's personal knowledge or skill." (quoting Restatement (Third) of Unfair Competition § 42 cmt. E)). These agreements likely are "reasonably necessary" to protect Australian Gold's confidential information and earned business advantage. *Ackerman*, 652 N.E.2d at 510. And they are not "unreasonably restrictive" of Ozell as they require only that the information gained or created within the scope of her employment belong to Australian Gold. *Id.*

Second, Australian Gold has established a likelihood of success in proving that Ozell breached the agreements; it has shown how it "proposes to prove the key elements of its case." *Grubhub Inc.*, 80 F.4th at 844. Consider the wealth of largely undisputed evidence submitted: the Confidentiality Agreement, the Employee Handbook[2], and affidavits from the CEO, Ozell's supervisor, and the IT technician that conducted the investigation. (*See* ECF Nos. 1-1, 1-2, 1-3, 6-1, 6-2, 6-3.) The Confidentiality Agreement dictates that the files at issue belong to Australian Gold and that Ozell must not disclose the confidential information they contain. But Ozell took those files with her on her way out of Australian Gold's doors: Australian Gold's investigation revealed that Ozell connected her personal drive to her company computer on six different occasions, copied over 500 files onto the drive, and deleted

[2] Ozell takes issue that part of the evidence Australian Gold submitted in support of preliminary relief is "an anonymous, unsworn letter" that she claims is "hearsay." (Def.'s Resp. 3, ECF No. 19.) But "hearsay can be considered in entering . . . preliminary [relief]." *S.E.C. v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991). Still the Court does not consider the Anonymous Letter here.

those files from her company computer, (Jester Decl. ¶ 46–48, ECF No. 6-3), and Ozell has admitted to taking the files, (Def.'s Resp. 1–2, ECF No. 19). And Australian Gold is likely to succeed in showing that those actions are breaches of the provisions to which Ozell agreed. The caselaw likewise would support the finding that such actions constitute breach. *See Badger Daylighting Corp. v. Palmer*, No. 1:19-CV-02106, 2019 WL 4572798, at *8 (S.D. Ind. Sept. 20, 2019) ("Indiana courts have consistently found [that a plaintiff is likely to succeed on a claim that] non-disclosure provisions were breached" where an "employee . . . sneak[s] away from his job with his employer's documents in hand.") Australian Gold has thus presented strong evidence that Ozell violated the "clear and unambiguous language" of her agreements. *Ryan*, 72 N.E.3d at 914.

Ozell's assertion that "[a] portion of the files on the Memorex drive are [her] . . . own work products" does not change that Australian Gold can likely show she breached the agreement. (Def.'s Resp. 2, ECF No. 19.) For one, her assertion is belied by the text of Confidentiality Agreement, which states that her work product created during her tenure at Australian Gold belongs to Australian Gold. And whether she breached the Agreement is determined by the Agreement's terms, not by Ozell's own atextual and subjective assertions. *See Michels*, 497 N.E.2d at 589–91. For another, her statement—that "[a] portion of the files" she took are hers—amounts to a further admission that some of the files she took *are not* her work product. That admission raises an even stronger inference that she breached her contract.

Third, Australian Gold can likely show damages relevant to breach of contract. At this stage, Australian Gold does not need to show what its damages would be. Instead, it needs only to show that it has been harmed, and a damages determination will come later. *See Washel v. Bryant*, 770 N.E.2d 902, 906–07 (Ind. Ct. App. 2002) (entering injunction where the plaintiff was harmed, but the precise amount of damages were yet to be determined). Australian Gold is likely to show that Ozell's theft and deletion of hundreds of documents caused it harm.

In sum, Australian Gold is likely to succeed on the merits of its breach of contract claim.

**2. Trade secrets**

Australian Gold is also like to succeed on its trade secrets claims.

Trade secrets are protected under both federal and state law, and their protections are generally coextensive. Trade secrets claims have two elements: "[E]ach requires the existence of a trade secret and its misappropriation." *Chroma Cars, LLC v. Harris*, No. 3:21-CV-825 DRL-MGG, 2022 WL 1686530, at *3 (N.D. Ind. May 25, 2022); *see MRBRAZ & Assocs., PLLC v. Macle, Inc*, No. 1:25-CV-02439-RLY-MJD, 2026 WL 2631302, at *3 (S.D. Ind. June 26, 2026) (listing the two elements); *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995) (addressing the two elements in context of Illinois's parallel law). "[T]he term 'trade secret' means" all types of information—"financial, business, scientific, technical, economic, or engineering"—including "plans, compilations, . . . formulas, designs, . . . techniques, [and] processes." 18 U.S.C. § 1839(3); Ind. Code § 24-2-3-2 (defining trade secret as

"information, including a formula, pattern, compilation, program, device, method, technique, or process"). Both federal and Indiana law expressly authorize injunctions for "actual or threatened misappropriation." 8 U.S.C. § 1836(b)(3)(A)(i); Ind. Code § 24-2-3-3(a).

To be a protectable trade secret, the information must meet two prongs. First, the information must be one of "actual or potential" "economic value" that is not "generally known to" or "readily ascertainable through proper means by" other people or entities. 18 U.S.C. § 1839(3)(B); *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021); Ind. Code § 24-2-3-2 (same definition). Indiana courts have described the question as "whether the information is readily accessible to a reasonably diligent competitor." *Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 918 (Ind. 1993) (citation modified). Second, the business must have taken "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A); *Life Spine, Inc.*, 8 F.4th at 540; Ind. Code § 24-2-3-2 (requiring that the information "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy"). A business can take "reasonable measures" to keep information private without taking "every conceivable measure" to do so. *Life Spine, Inc.*, 8 F.4th at 542. Entering into confidentiality agreements is an example of a reasonable measure.

A business can show misappropriation of a trade secret "through any of three actions: (1) acquisition, (2) disclosure, or (3) use." *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 484 (7th Cir. 2024) (citation modified), *reh'g and reh'g in banc dismissed*, No. 22-2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024), *and*

*cert. denied*, 145 S. Ct. 1182 (2025). The acquisition of a trade secret constitutes misappropriation if it was acquired "by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5); Ind. Code § 24-2-3-2 (same). And "improper means" includes "a breach of a duty to maintain secrecy." *Id.*; 18 U.S.C § 1839(3)(6)(A) (same). A trade secret is misappropriated through disclosure when it is disclosed "without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was" improperly acquired. 18 U.S.C. § 1839(3)(5)(B); Ind. Code § 24-2-3-2 (same).

Here, Australian Gold is likely to meet the two elements necessary to state a trade secret claim. To start, the information that Ozell took falls within the broad definition of "trade secrets" under both federal and state law. *See* 18 U.S.C. § 1839(3) (covering "all types of information," including "financial, business, scientific, technical, economic, or engineering" information); Ind. Code § 24-2-3-2 (same); (*see also* Pl.'s TRO Br. 17, ECF No. 6 (listing information stolen as "research," "formulas," "supplier information," and "manufacturing processes").

Turning to the first element, Australian Gold can likely show the existence of a trade secret: The information Ozell took is of economic value that is not generally known to others, and Australian Gold has taken "reasonable measures" to keep that information confidential. *Life Spine, Inc.*, 8 F.4th at 540.

The information Ozell took has economic value to Australian Gold and is not "generally known to" outsiders. 18 U.S.C. § 1839(3)(B). As Australian Gold

explained, the information is valuable because of "the time, expense, and expertise Australian Gold has invested in developing" all this information. (Pl.'s TRO Br. 17, ECF No. 6); *Amoco Prod. Co.*, 622 N.E.2d at 918 ("[W]here the duplication or acquisition of alleged trade secret information requires a substantial investment of time, expense, or effort, such information may be found not being readily ascertainable so as to qualify for protection under the Indiana Uniform Trade Secrets Act." (internal quotation marks omitted)). "It frequently takes several years of scientists' and engineers' time and effort to arrive at the detailed formula" for any given product, which is why such formulas are some of a company's "most valuable assets and most closely guarded secrets." *Bridgestone Americas Holding, Inc. v. Mayberry*, 878 N.E.2d 189, 194 (Ind. 2007). Australian Gold's assertions are consistent with that principle. And Australian Gold's "effort [in] compiling useful information"—such as its vendor, supplier, or pricing information—is of economic value, too, because it likely represents a "unique compilation of information not previously known in the marketplace." *Amoco Prod. Co.*, 622 N.E.2d at 920. Thus, here, the economic value of this information stems from the competitive advantage Australian Gold has gained through its research.

Australian Gold can also likely show it took "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A); Ind. Code § 24-2-3-2. Australian Gold requires employees to agree to comply with "confidentiality and non-disclosure obligations." (Pl.'s TRO Br. 18, ECF No. 6 (citing Sperry Decl. ¶ 9, ECF No. 6-1).) Australian Gold also "keeps its electronically-stored Confidential Information on

password-protected systems and restricts physical access to its facilities through key fobs. (*Id.* at 18–19 (citing Sperry Decl. ¶ 9, ECF No. 6-1).) These types of measures are likely sufficient to establish that Australian Gold took reasonable measures to keep the information private. *See Toyota Indus. Equip. Mfg., Inc. v. Land*, No. 1:14-CV-1049-JMS-TAB, 2014 WL 3670133, at *6 (S.D. Ind. July 21, 2014) (finding a business took reasonable measures when it "marked [documents] as confidential and as being the property of "the business"); *Vickery v. Ardagh Glass Inc.*, 85 N.E.3d 852, 864–65 (Ind. Ct. App. 2017) (affirming the trial court's finding that the employer took reasonable measures to protect its trade secrets when it (1) required a key fob and passcode for its office; (2) used password-protecting computers and emails, (3) limited employee access to certain files, and (4) adopted a code of conduct that required employees to protect the company's trade secrets).

On the second prong, Australian Gold is likely to succeed in showing that Ozell misappropriated its trade secrets. In fact, the misappropriation here resembles the quintessential "trade secret case" where a "former employee has knowledge of a special [confidential information] . . . and can give a competitor an unfair advantage by transferring the [information] . . . to that competitor." *PepsiCo, Inc.*, 54 F.3d at 1270.

Australian Gold is likely able to show misappropriation in two ways.

For one, it can likely show that misappropriation *already occurred*: that Ozell's "acquisition" of the trade secrets violated federal and Indiana law because she did so

by "breach[ing] [her] . . . duty to maintain secrecy." Ind. Code § 24-2-3-2; 18 U.S.C § 1839(3)(6)(A); *see supra* III.A.1.

For another, Australian Gold is likely able to show that misappropriation is likely to be improperly disclosed in the future: that Ozell's "pre-departure harvesting of [Australian Gold's] proprietary information" creates a real "threat of [additional] misappropriation." *Ackerman*, 652 N.E.2d at 510–11; *Land*, 2014 WL 3670133, *6 (granting preliminary relief where forensic investigation showed the employee put company files on his personal drive, even though there was "no evidence that he ha[d] transmitted [the company's] trade secrets to any third party"); *Badger Daylighting Corp.*, 2019 WL 4572798, at *10 ("As many courts before us have concluded in reviewing such cases, an employee who illicitly takes and retains his employer's proprietary information creates a risk of disclosure and misappropriation that warrants a finding that the movant has a reasonable likelihood of success on the merits of these legal claims.") Ozell's actions over time and at the eleventh hour indicate a concrete likelihood of disclosure of specific trade secrets, rather than just the possibility of "inevitable disclosure" of generalized information Ozell learned during her employment with Australian Gold.

Ozell's counterarguments are unavailing.

First, she argues that Australian Gold cannot seek relief based only on the "unsupported assertion" that Ozell's "new role makes misuse 'inevitable.'" (*Id.* at 3.) But as Australian Gold points out, it is not seeking an injunction based on a generalized concern that Ozell will inevitably use information she learned at

Australian Gold at her new employer. (Pl.'s Reply 5, ECF No. 21); *cf. AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1204–05 (7th Cir. 1987) (discussing the inevitable disclosure doctrine where the plaintiff was unable to show that the former employee "ever systematically recorded, copied, compiled, or even purposefully memorized" any confidential information, and instead claimed the employee had "an inherent conflict of interest making it inevitable that he will use or disclose AMP trade secret information"). Instead, Australian Gold seeks injunctive relief based on the particularized evidence that Ozell has improperly taken specific documents and confidential information. (*Id.*) That is the type of injunctive relief federal and state law authorize. *See* 8 U.S.C. § 1836(b)(3)(A)(i); Ind. Code § 24-2-3-3(a). Australian Gold is permissibly seeking to enjoin disclosure of information that has been improperly acquired.

Ozell also contends that Australian Gold is not likely to succeed on its claim because it has not identified trade secrets with sufficient particularity. (Def.'s Resp. 3–4, ECF No. 19.) But the Seventh Circuit has affirmed a permanent injunction to protect a business's protectable interest in its "operating manuals," "process standards" and custom "formulations." *3M v. Pribyl*, 259 F.3d 587, 593 (7th Cir. 2001). If that articulation of a trade secret is sufficient to enter permanent injunctive relief, Australian Gold's descriptions are sufficient to enter temporary injunctive relief. *See Land*, 2014 WL 3670133, at *4, 8 (granting preliminary injunction where the plaintiff identified "product specifications, pricing strategies, [and] design and testing data" as trade secrets"); *BioConvergence LLC v. Attariwala*, No. 1:19-CV-

01745, 2019 WL 6893704, at *10 (S.D. Ind. Dec. 18, 2019) (granting preliminary relief where plaintiff stated the stolen documents included: "confidential information relating to [the business's] clients' products; client contact information; client project plans; manufacturing timelines and estimates; engineering specifications; daily operation reports; supply chain document[s]"). And to the extent Ozell's particularity argument hinges on Australian Gold's failure to "distinguish between information that is genuinely its proprietary secret and information that is . . . Ozell's own work product," (*id.* at 4), that is a reiteration of her same contract arguments that the Court has already addressed. Again, "her own work," likely does not include work that she developed at Australian Gold pursuant to her agreements. And of course, submitting the Memorex device for inspection will reveal the character of the files thereon and if any of the files are truly her own personal documents.

* * *

Australian Gold has shown it is likely to succeed on the merits of its breach of contract and federal and state trade secrets claims. It has shown—in great detail for this stage in the proceedings—how it intends to "prove the key elements of its case." *Grubhub Inc.*, 80 F.4th at 844.

Because Australian Gold has shown it is quite likely to succeed on the merits, under the sliding scale approach, it does not need to make as strong of a showing under the remaining prongs to show that a TRO is warranted. *Abbott Lab'ys*, 971 F.2d at 12. The Court nonetheless finds that those factors, too, strongly support granting Australian Gold this preliminary relief.

**B. Irreparable Harm**

To obtain a TRO, the moving party must show "that he will likely suffer irreparable harm absent" the TRO. *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ*, 858 F.3d 1034, 1044 (7th Cir. 2017). There is not a "presumption of irreparable harm" just because a plaintiff shows a likelihood of success on a trade secrets claim. *Life Spine, Inc.*, 8 F.4th at 545.

"Harm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). "[T]he difficulty of pinning down what business has been or will be lost" can make an injury irreparable. *Life Spine, Inc.*, 8 F.4th at 546 (quoting *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005)). Likewise, harm is irreparable if it "will probably have lingering, incalculable economic consequences even if final relief on the merits" is granted. *Abbott Lab'ys*, 971 F.2d at 17.

Crucially, the irreparable harm standard does not "require that the harm actually occur before injunctive relief is warranted." *Whitaker*, 858 F.3d at 1045 (citation modified). "Nor does it require that the harm be certain to occur before a court may grant relief on the merits." *Id.* Instead, the question is whether the impending harm "cannot be prevented or fully rectified by the final judgment after trial." *Id.*

Here, Australian Gold has shown that it will likely suffer irreparable harm absent a TRO. If Australian Gold's confidential information gets to a competitor, it would be difficult to identify "what business has been or will be lost" as a result. *Life Spine,*

*Inc.*, 8 F.4th at 546. Indeed, Australian Gold "will face the irreparable harm of being placed at an unfair competitive disadvantage for which monetary damages will be very difficult to quantify." *Land*, 2014 WL 3670133, at *7. And it is not just likely, *Whitaker*, 858 F.3d at 1045, but *highly* likely that this irreparable harm—the disclosure and ensuing consequences—will occur, given the suspicious circumstances under which Ozell took and deleted the files and promptly joined one of Australian Gold's direct competitors.

In the event Australian Gold's trade secrets were disclosed, the scope of relief would depend on (1) what the state of Bell Lab's research was before it received the information, (2) how long it would have taken it to discover or compile this information on its own, and (3) how obtaining this information changed its plans, development, or products—and all of these answers may be different depending on the specific type of information at issue. Even if these questions could be answered, the Court would then need to quantify the scope of any advantage. This would entail the type of difficulties and uncertainties that the Seventh Circuit has found makes an injury irreparable. *See Life Spine, Inc.*, 8 F.4th at 546. Ozell makes several arguments in attempting to show that Australian Gold's harm is not irreparable—but none are convincing.

She first claims that the Court cannot grant preliminary relief unless "immediate and irreparable injury will occur if such seizure is not ordered." (Def.'s Resp. 2, ECF No. 19 (quoting 18 U.S.C.A. § 1836(b)(2)(A)(ii)(II)). But that provision is not relevant because it applies only to ex parte seizure orders, and Ozell—who raised this

argument in *opposition* to the TRO—has notice of the proposed preliminary relief. Moreover, the correct standard is whether Australian Gold is *likely* to suffer irreparable harm—not that it will *certainly* happen absent preliminary relief. *Whitaker*, 858 F.3d at 1045.

Ozell next argues that Australian Gold has suffered no harm. (Def.'s Resp. 4, ECF No. 19.) More specifically, she contends that the harm Australian Gold alleges is mere "internal inconvenience, not competitive injury." (*Id.*) But that argument assumes one of two things: either that Australian Gold seeks relief only from Ozell's past acquisition and deletion of the files, or that Australian Gold must show it has already suffered competitive injury as a result of Ozell's taking. Both are wrong. For one, the effort spent investigating and restoring the files Ozell took "is not the basis for its claim for injunctive relief." (Pl.'s Reply 8, ECF No 21.) For another, "Australian Gold need not wait for the 'competitive injury' to materialize" in order to get relief. (*Id.* at 9.) The proper standard is whether the moving party is likely to show irreparable harm absent preliminary relief. *Whitaker*, 858 F.3d at 1045. And as explained, Australian Gold has met that standard.

Ozell then contends that "[t]here is no evidence that [she] . . has used or disclosed anything at all." (Def.'s Resp. 4, ECF No. 19.) She further contends that Australian Gold alleges only a "speculative risk of future harm" which is not irreparable, and that "to the extent the files are her own work product, there is no 'secret' to lose." (*Id.*) The latter argument, as before, is a reiteration of her own subjective assertion of her rights—and one that is belied by the agreements she signed with Australian

Gold. And the former argument, that the harm is only speculative, is also wrong. Ozell, "an employee of a direct competitor," "is indisputably in unlawful possession of substantial Australian Gold trade secret information." (Pl.'s Reply 9, ECF No 21); And the Court agrees with Australian Gold that "her behavior at the end of her employment is strong evidence of her malicious intent." (*Id.*) So that threat is far from speculative. *BioConvergence LLC*, 2019 WL 6893704, at *14 ("[The defendant's] refusal to disclose, or even admit what she has taken even after it was discovered, coupled with her persistent pattern of withholding accounts and devices, leaves us highly skeptical that without the preliminary injunction [the company's] interests can[] be protected."); *Land*, 2014 WL 3670133, at *7 ("[A]n ongoing threat of potential or actual misappropriation continues, given that the Court cannot conclude that [the defendant] no longer possesses or has access to Plaintiffs' confidential information and trade secrets.").

Finally, Ozell argues that Australian Gold has an adequate legal remedy because the Confidentiality Agreement "contains a liquidated damages provision." (Def.'s Resp. 4, ECF No. 19.) The Court notes that, in substance, this argument is a contractual one. And Indiana courts have faced this exact question and have squarely rejected Ozell's argument. "[T]he right to injunctive relief is not contingent upon the text of the agreement," so a "liquidated damages clause in the parties' agreement does not obviate [the plaintiff's] right to injunctive relief." *Washel*, 770 N.E.2d at 906 (internal citations omitted); *Ed Bertholet & Assocs., Inc. v. Stefanko*, 690 N.E.2d 361, 363 (Ind. Ct. App. 1998) ("In Indiana, parties may not contractually oust the

[equitable] jurisdiction of the courts."). And a "legal remedy is not adequate merely because it exists as an alternative to an equitable form of relief." *Washel*, 770 N.E.2d at 906–07. This principle stands particularly true here, because the $1,000 per occurrence liquidated damages provision would be "seriously deficient as compared to the harm suffered." *Life Spine*, 8 F.4th at 545. So, if anything, the existence of the liquidated damages provision emphasizes how an after-the-fact legal remedy would be inadequate.

* * *

In sum, the irreparable harm factor also tilts heavily in favor of granting Australian Gold preliminary relief. The unquantifiable harm it has suffered and is likely to suffer is precisely the type of "irreparable harm" that a TRO may be used to prevent.

**C. Balance of Equities and Public Interest**

Finally, the Court must balance the equities and consider the public interest in denying or granting the TRO.

In balancing the equities, the Court contemplates what "irreparable harm the moving party will endure if the [TRO] is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted." *K.C.*, 121 F.4th at 632. In other words, it calculates and seeks to "minimize the costs of being mistaken." *Abbott Lab'ys*, 971 F.2d at 12 (quoting *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986)). And "the sting of a preliminary injunction . . . depend[s]

upon its scope." *Abbott Lab'ys*, 971 F.2d at 19. So a TRO will be less likely to cause the nonmoving party harm if it is narrowly tailored. *Id.*

In considering the public interest, the Court asks what "effect[] granting or denying the preliminary [relief] would have on nonparties." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (internal quotation marks omitted). The Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation marks omitted).

Here, the final two factors also lean in favor of granting the TRO.

As an initial matter, the Court notes that the scope of relief Australian Gold seeks is quite narrow. The requested TRO contains three specific components. (Proposed TRO 2, ECF No. 5-1.) First, it asks the Court to enjoin Ozell from "from having in her possession, custody, or control and from directly or indirectly using or disclosing" Australian Gold's confidential information. (*Id.*) Second, it asks to prohibit "Ozell from breaching" the Confidentiality Agreement "by using or disclosing" Australian Gold's confidential information. (*Id.*) Finally, it asks the Court to require Ozell to identify and return all confidential information she deleted, and to mandate "independent verification of her compliance with these requirements." (*Id.*) The first two components of the requested TRO merely require Ozell to comply with existing obligations under trade secrets law and under the Confidentiality Agreement and Handbook. The final component seeks to prevent the irreparable harm that would come from disclosure of its information.

With the narrow scope of relief in mind, the balance of harm factor weighs in favor of granting preliminary relief.

In truth, Ozell "has not demonstrated that [she] will suffer *any* harm from having to comply with the [Court's] preliminary injunction order." *Whitaker*, 858 F.3d at 1054 (emphasis added). Requiring Ozell to keep her contractual obligations and not further violate federal and state trade secrets law cannot be said to be "harm" at all. *See Weiss*, 2019 WL 6050176, at *9 ("An injunction simply would not allow him to breach the contract he entered into.") And any information "known to her" prior to entering into the contractual agreements with Australian Gold—or the general skills she developed during her employment with Australian Gold—will not be impacted by the injunctive relief. To the extent the third component of requested relief—to identify and return confidential information and obtain "independent verification of her compliance with these requirements"—could potentially be "harm," such harm would be minor, as Ozell "possesses the keys to her release." *BioConvergence LLC*, 2019 WL 6893704, at *14 (citation modified). "If and when [Ozell] . . . fulfills her disclosure and production obligations by providing adequate evidentiary assurances that she no longer possesses" trade secret information, she will no longer feel the weight of this requirement. *Id.*

By contrast, Australian Gold is likely to suffer irreparable harm if the TRO is "wrongfully denied." *K.C.*, 121 F.4th at 632; *see supra* III.B.

The public interest would also plainly be served by granting the TRO. The public has an "interest in the enforcement of contracts and protection of trade secrets and

confidential information." *Life Spine, Inc.*, 8 F.4th at 546. Enforcing "[t]rade secret law serves to protect standards of commercial morality and encourage invention and innovation while maintaining the public interest in having free and open competition in the manufacture and sale of unpatented goods." *PepsiCo, Inc.*, 54 F.3d at 1268 (citation modified); *Amoco Prod. Co.*, 622 N.E.2d at 921. There exists an overwhelming consensus in federal and Indiana law that upholding trade secrets law—and contracts that seek to protect trade secrets—is in the public interest. *Kozuch v. CRA-MAR Video Ctr.*, Inc., 478 N.E.2d 110, 114 (Ind. Ct. App. 1985) (enforcing trade secrets law "promot[es] of the development of new products and technology"); *CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1065 (S.D. Ind. 2010) ("The public interest here, which favors [the plaintiff], is clearly embodied in the Indiana Uniform Trade Secrets Act, which aims to prevent harm like that alleged."); *Vickery*, 85 N.E.3d at 865 (stating that there is a "strong public interest in enforcing contracts that represent the freely bargained-for interests of the contracting parties").

Because Ozell "does not have a right to possess, use, or disclose [Australian Gold's] confidential information or trade secrets, the public will not be harmed" by ordering a TRO. *Land*, 2014 WL 3670133, at *8.

Ozell attempts to rebut these conclusions. But here, again, Australian Gold has the better of each argument.Ozell primarily contends that the "TRO would impose a severe hardship" on her by "restricting her ability to earn a living." (Def.'s Resp. 5, ECF No. 19.) She claims that the TRO would "effectively bar" her "from working in her field, or from using the skills and knowledge she developed." (*Id.* at 4–5 (stating

the TRO would operate as a "de facto non-compete").) But Australian Gold has made it clear that "Ozell remains free to work as a chemist, so long as she does so without Australian Gold's Confidential Information." (Pl.'s TRO Br. 27, ECF No. 6.) "Against this backdrop," the Court agrees with Australian Gold that "it is highly concerning that Ozell contends she cannot 'earn a living' if she is dispossessed" of its trade secrets. (Pl.'s Reply 12, ECF No. 21 (emphasis omitted).) The admission that she needs Australian Gold's confidential information to be able to work only solidifies that the risk of future misappropriation—and accompanying irreparable harm—is quite likely to occur.

Ozell also argues that the federal trade secrets law "expressly limits the injunctive relief that" Australian Gold seeks. (Def.'s Resp. 2, ECF No. 19.) Not so. Although Ozell claims Australian Gold is seeking to "place[] conditions" on her based "merely on the information" she knows, (*id.* (quoting 18 U.S.C. § 1836(b)(3)(A)(i)(I))), the "information she knows" resides in her own memory—not in the files she took. Moreover, the knowledge she developed during her tenure at Australian Gold is not the type of information subject to injunctive limits. (*See* Proposed TRO 2, ECF No. 5-1.) Even with the TRO in place, Ozell "is free to take with [her] the general skills and knowledge acquired during [her] tenure with [her] former employer." *Amp Inc. v. Fleischacker*, 823 F.2d 1199, 1202 (7th Circ. 1987); (*contra* Def.'s Resp. 3, ECF No. 19). But again, the "skills and knowledge [Ozell] developed" at Australian Gold would be found in her own mind—not in her drive filled with stolen files. (Def.'s Resp. 5, ECF No. 19.)

Ozell also argues that the TRO would be burdensome because it would "reach[] her personal devices." (*Id.*) She also believes that the independent verification component cannot be imposed because it is too "undefined." (*Id.*) The Court believes the parties can decide how this independent verification requirement will be met. But, however it is met, the Court agrees with Australian Gold that it will not be overly burdensome. Australian Gold believes "it is unlikely Ozell would need to be physically dispossessed of any personal devices, given the ability of forensic firms to image devices remotely." (Pl.'s Reply 13, ECF No. 21.) And if the verification does require Ozell to temporarily lose access to her devices, such harm is still trivial compared to the irreparable harm impending for Australian Gold.

The Court addresses one final component of the TRO: security. Rule 65(c) requires that a bond be imposed before preliminary relief can be granted. The "movant gives security in an amount that the [C]ourt considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). This bond amount should be sufficient to cover the "costs imposed on the party against whom the injunction ran." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 459 (7th Cir. 2010).

Here, the Court finds that a bond of $5,000 is appropriate. As discussed above, the TRO imposes negligible costs on Ozell. The only real cost she could incur is the cost of her time in identifying the information she took, returning that information, and obtaining independent verification of her compliance. Five thousand dollars

should be sufficient to compensate her for the "costs imposed," *Habitat Educ. Ctr.*, 607 F.3d at 459, if the TRO turns out to be imprudently issued.[3]

* * *

The Court exercises "wide latitude in fashioning injunctive relief." *PepsiCo, Inc.*, 54 F.3d at 1272. And it finds that Australian Gold's requested relief reflects a "reasonable middle ground," *Abbott Lab'ys*, 971 F.2d at 23—minimizing its own likely irreparable harm while imposing relatively little, if any, harm on Ozell.

## IV. Conclusion

For the foregoing reasons, Australian Gold's Motion for a Temporary Restraining Order, (ECF No. 5), is **granted**. The TRO shall remain in place until **midnight on December 23, 2026.**[4] Ozell is thus **enjoined** from possessing, using, or disclosing Australian Gold's confidential information, **prohibited** from breaching her Confidentiality Agreement, and **required** to identify and return all confidential information, and to **confirm** compliance with the previous requirement through

[3] Ozell, rather than quibbling with Plaintiff's suggestion of a bond not exceeding $5,000 as being appropriate in this case, urged that the amount of the bond be "meaningful." (Def.'s Resp. 5, ECF No. 19.) Still, if Ozell believes this bond amount is "not meaningful," she may file a motion with the Court explaining what bond amount she believes would be appropriate.

[4] Federal Rule 65(b)(2) seems to impose a 14-day time limit for TROs only where a defendant does *not* have notice. *See* Fed. R. Civ. Pro 65(b)(2); *see also Clarksville Ministries, LLC v. Town of Clarksville*, No. 421CV00135T, 2021 WL 4898204, at *5 (S.D. Ind. Sept. 7, 2021) ("[T]he Court could find no precedent directly on point concerning the 14-day limit on TROs that have had formal notice to the defendant."). Nonetheless, the Seventh Circuit has stated that "the great weight of authority support the view that 28 days is the outer limit for a TRO without the consent of the enjoined party, regardless of whether the TRO was issued with or without notice." *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 844 (7th Cir. 2012). The Court therefore orders that the TRO will remain in place for 28 days, until December 23, 2026. *See Luxottica Grp. S.p.A. v. Light in the Box Ltd.*, No. 16-CV-05314, 2016 WL 11940344, at *4 (N.D. Ill. Sept. 6, 2016) (issuing a 28-day TRO where the defendant had notice). A 28-day period also is prudent because the preliminary injunction briefing will be completed on that date. (*See* ECF No. 26.)

independent verification. Australian Gold must **pay a $5,000 bond** imposed under Rule 65(c).

**SO ORDERED.**

Date: 11/25/2026

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Justin A Allen
Ogletree Deakins Nash Smoak & Stewart, P.C.
justin.allen@ogletree.com

Malak Christian Mercho
Mercho Strzynski LLP
chris@msfirm.law

Christopher C. Murray
Ogletree Deakins
christopher.murray@ogletree.com